Pete Tacconi v. Commissioner.
Tacconi v. Commissioner
Docket No. 37519.
United States Tax Court
1954 Tax Ct. Memo LEXIS 300; 13 T.C.M. (CCH) 142; T.C.M. (RIA) 54052; February 15, 1954
*300 Respondent reconstructed petitioner's net income for the years 1942 to 1946 by employing the increase in net worth-plus personal expenditures method. Deficiencies and 50 per cent fraud penalties were determined for each year. 1. Held: Respondent's resort to the alternative method of computing income approved. 2. Held: The deficiencies were due to fraud with intent to evade tax. Stanley L. Drexler, Esq., and Max B. Lewis, Esq., for the petitioner. Francis Campbell, Jr., Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and 50 per cent additions thereto for fraud, section 293 (b), Internal Revenue Code, as follows: Year
Deficiency
50% Addition
1942
$ 3,223.20
$1,611.60
1943
3,419.49
1,709.74
1944
19,130.67
9,565.34
1945
928.29
464.15
1946
9,895.42
4,947.71
The respondent determined the deficiencies upon the basis of net income which he reconstructed by the use of the method known as increase in net worth plus personal expenditures. The issues for decision are: (1) whether respondent was justified in resorting to *301 the above mentioned method of reconstructing net income; (2) whether the respondent's reconstruction of net income was correct and, particularly, whether he was right in not crediting petitioner with any cash on hand immediately prior to the beginning of each taxable year involved; and (3) whether any part of the deficiencies was due to fraud with intent to evade tax. A minor issue is whether the forgiveness provision, section 6, of the Current Tax Payment Act of 1943 is applicable to petitioner's tax liability for the years 1942 and 1943. Findings of Fact Certain facts were stipulated and are so found. Petitioner, an individual, is and was during the taxable years 1942 through 1946, inclusive, a resident of Ogden, Utah. He reported his income for tax purposes on a cash receipts and disbursements basis and his income tax returns for the years herein involved were filed with the collector for the district of Utah. Tacconi was born in Italy in 1894 and came to the United States in 1911 or 1912. He had received no formal education and was unable to speak English on his arrival in this country. He worked for a number of manufacturing concerns in Kenosha, Wisconsin, until *302 1921, when he moved to Superior, Wyoming. There he worked as a barber for three or four years, giving up the trade when he was unable to earn a living at it. In 1928, he moved to Rock Springs, Wyoming, where he operated several pool halls and a bar and engaged in bootlegging and gambling activities. In 1934, Tacconi moved to Salt Lake City, Utah. In 1937, he sustained two broken legs in an automobile accident, as a result of which he brought suit for damages. In connection with his appeal from the trial court's order directing a verdict for the defendant, petitioner, on August 16, 1937, signed and swore to an affidavit of poverty, reading in part as follows: "PETE TACCONI being first duly sworn deposes and says: That he is the above named plaintiff; that as such plaintiff and in said action he is prosecuting his appeal to the United States Circuit Court of Appeals, Tenth Circuit, from a verdict and judgment made and entered in said cause; that because of his poverty he is unable to pay the costs incident to and incurred by such appeal, and is not able to furnish a bond or give other security for the payment of the same; that he owns no property either personal or real excepting *303 his wearing apparel and personal effects, all of which are exempt from execution under the laws of Utah, and, moreover, because of his physical condition caused by the accident and collision referred to and involved in said cause, he is unable to work; that in order to pay expenses heretofore incurred since said accident and collision, he has borrowed from friends, but is now unable to borrow further; that his credit for borrowing purposes has been practically exhausted; that he believes that he is entitled to the relief and redress that he seeks in said appeal; that in said appeal and the proceedings in connection therewith, he seeks a reversal of the judgment of the United States District Court for the District of Utah, Central Division in said cause, and a new trial of said action order, upon the ground that the court erred in directing the jury to render a verdict in favor of the defendant and against the plaintiff." This affidavit was filed in the United States District Court, District of Utah, on August 18, 1937. It was agreed between petitioner and his attorney in the above mentioned litigation that the latter's sole compensation would be 50 per cent of any recovery. Petitioner *304 was inactive in any business from 1934 until 1940. In 1937, he married Letha Tacconi who was the mother of two small children by a former husband. In 1939, he moved to Ogden, Utah. To gain his livelihood, petitioner gambled as a player and invested a little money in two hotels. In January, 1940, petitioner leased a thirteen room establishment in Ogden known as the Wilson Rooms. He repaired, remodeled and furnished the premises to some undeterminable extent. He paid the rent but did not personally operate the establishment. Sometime in 1943, he disposed of whatever interest he had in the Wilson Rooms. Petitioner never reported the receipt of any income from this source. Early in 1940, petitioner leased the Golden Hotel in Ogden. He paid the rent and other expenses such as electricity and telephone. Louise Wilson, not petitioner, managed the hotel. On or about December 3, 1945, petitioner bought from Louise Wilson for approximately $5,000 the furniture and other personalty at the Golden Hotel. Petitioner operated the Golden Hotel thereafter until July 30, 1946, when he sold about one-half of the furniture for $792 [1] and removed the rest. Petitioner reported in his 1946 income tax *305 return, the only return in which reference is made to the Golden Hotel, a net loss from the Hotel's operation of $261.41. On July 2, 1940, petitioner rented a safe deposit box in the First Security Bank of Utah, Ogden Branch (hereinafter referred to as First Security Bank). In 1940, he visited his box on fifteen occasions. Sometime prior to December 31, 1940, petitioner opened a checking account in his own name at the First Security Bank. This account remained open until July 30, 1945. At the close of 1940, petitioner had $160.99 on deposit in the First Security Bank. On September 11, 1941, petitioner opened a savings account in the name of his wife, Letha Tacconi, at the First Security Bank. This account remained open throughout the taxable years. On September 15, 1941, petitioner opened a savings account in his own name at the First Security Bank. This account remained open until March 25, 1946, when the balance was withdrawn. In 1941, petitioner "entered" his safe deposit box 26 times. Nine of these visits were made on the same day that petitioner *306 deposited odd amounts in his checking account. His safe deposit box entry of September 15, 1941, coincided with his initial deposit of $1,005 in his savings account. None of the dates on which deposits were made in Letha Tacconi's savings account during 1941 coincided with petitioner's entries into his safe deposit box. In 1941, there were deposited in petitioner's checking account, savings account and savings account in his wife's name the following amounts, respectively: $5,276.98, $1,005, and $941. Petitioner filed no income tax return for 1941 or for any previous year. Petitioner bought the furniture and fixtures of the Windsor Hotel, Ogden, and operated the hotel from June 1, 1942, until approximately November 30, 1945, when he sold his property therein for $7,500. Petitioner reported in his income tax returns net profit (loss) from the Windsor Hotel operations as follows: 1942
$683.51
1943
382.59
1944
914.35
1945
(53.97) [2] - gain from sale was $2,005.28
On September 4, 1942, petitioner opened *307 an account in his own name at the Ogden First Federal Savings and Loan Association (hereinafter referred to as First Federal). This account remained open through the taxable years. Petitioner and Sam Shortino operated the United Nations Club, a small night club, in Ogden, as a partnership from March, 1943, until February 6, 1944, at which time petitioner sold his partnership interest therein to Shortino. The partnership's income tax return for 1943 showed a net loss of $4,522.09, of which petitioner reported $2,410.09 as a loss, rather than one-half thereof, or $2,261.05, on his individual return. The partnership's income tax return for 1944 showed a net profit of $1,452.77, of which petitioner reported one-half thereof on his individual return. Petitioner did not report the sale of his partnership interest in the United Nations Club in his 1944 return. The account books of the United Nations Club on their face revealed no material inaccuracies. On February 10, 1944, petitioner opened a savings account in his own name at the Commercial Security Bank, Ogden. This account remained open until March 25, 1946, when the balance was withdrawn. On or about April 20, 1944, petitioner *308 purchased for approximately $18,000 the Canyon Club, a large lodge located on the outskirts of Ogden. Petitioner, in partnership with William M. Murphy, operated the Canyon Club as a night club from June 1, 1944, to June 30, 1945, when petitioner sold his partnership interest therein to Murphy at a loss. Petitioner received $400 per month rental for the property from the partnership and after its dissolution continued to receive the same amount throughout 1945 and 1946. On June 2, 1944, petitioner opened a checking account in the name of the Canyon Club at the Commercial Security Bank. This account remained open until August 14, 1945. Petitioner's signature was required on all checks drawn on this account. On November 13, 1944, petitioner opened a checking account in his own name at the Commercial Security Bank, which account remained open throughout the taxable years here involved. The account book showing receipts from the operations of the Canyon Club partnership was kept principally by petitioner. At the end of the month, petitioner and/or Murphy would take the receipts book together with bank statements and vouchers for cash disbursements to their accountant, G. H. Wrigglesworth, *309 who would make the appropriate entries in a cash journal and from there into a general ledger. When asked by Wrigglesworth why in both 1944 and 1945 the deposits to the Canyon Club bank account exceeded receipts, as recorded in the book kept by petitioner, the latter explained that such excess represented additional money deposited in the bank by the partners to keep the business going. Wrigglesworth never went to the night club to check the cash receipts nor was he ever furnished with the cash register tapes. From the books which he kept for the partnership, Wrigglesworth prepared the partnership's income tax returns for 1944 and 1945, which showed losses, respectively, of $12,990.18 and $4,063.41. Wrigglesworth also prepared petitioner's individual returns for each of the taxable years herein involved. Petitioner and his partner conducted at the Canyon Club gambling games from which was derived income that was not recorded in the receipts book kept by them. Neither the partnership's income tax returns nor the petitioner's individual returns showed income from gambling activities. On July 28, 1945, petitioner opened a checking account in the name of his wife, Letha Tacconi, at *310 the Commercial Security Bank, which account remained open throughout the taxable years herein involved. On February 12, 1946, petitioner drew a check to cash for $6,000 and Letha Tacconi drew a check to petitioner for $1,000. Both checks were paid by the bank on or before February 13, 1946, and the proceeds thereof were used by petitioner to defray legal expenses in a matter not connected with his business. On or about March 25, 1946, petitioner purchased a house for approximately $11,000. The next following schedule was attached to the notice of deficiency and shows for each of the taxable years here involved respondent's computation of petitioner's increase in net worth, petitioner's personal expenditures and drawings, less non-taxable gains and optional standard deduction, petitioner's corrected net income, his reported net income and his unreported income (net adjustment). The parties herein stipulated reference the schedule, as follows: "On December 31, 1941, 1942, 1943, 1944, 1945 and 1946, the petitioner had assets with a cost basis as shown in items 2 through 32, inclusive of Exhibit A attached to the Statutory Notice of Deficiency and entitled "Comparative Balance *311 Sheets". * * * Each party reserves the right to show that the petitioner had other assets at any of such dates and the petitioner reserves the right to show that the amounts set forth under Items 34 to 39, inclusive in said Exhibit A are incorrect." By the above stipulation, petitioner agreed to the correctness of respondent's findings, with the exceptions noted. The schedule is as follows: Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1941
1942
1943
1944
1945
1946
1. Cash on
Hand
$ 1,300,00
2. Savings
Acct. - Pete
T. 1st
Sec. Bk.
$1,005.00
$ 1,553.33
$ 2,008.43
$ 4,498.23
$ 4,543.32
3. Savings
Acct.-Letha
T. 1st
Sec. Bk.
941.00
78.40
371.50
1,159.82
1,031.20
3,254.00
4. Checking
Acct.-Pete
T. 1st
Sec. Bk.
179.12
705.28
942.35
1,572.43
5. Savings
Acct. Pete
T. Com-
mercial Sec.
3,820.97
3,859.27
Bk.
6. Checking
Acct. Pete
T. Comm.
Sec. Bank
4,244.48
6,476.98
563.56
7. Checking
Acct.
Letha T.
Comm. Sec.
1,433.35
45.51
Bk.
8. Accts.
Receivable-
United
Nations Club
$ 509.25
9. Savings
Acct. First
Fed. Bldg.
& Loan
$4,182.46
4,287.67
$4,577.88
$4,646.80
$4,716.76
10. U.S.
Government
Bonds
$3,000.00
$3,375.00
4,012.50
4,143.75
4,143.75
4,143.75
11. Accts.
Receivable
Canyon
Club
& William
4,036.41
2,500.00
Murphy
12. Accts.
Receivable-
A. L. Bar-
nett
4,950.00
5,502.24
13. Accts.
Receivable-
J. E.
Sanches
3,400.00
14. Accts.
Receivable-
Mike Fauero
2,300.00
15. Accts.
Receivable-
F. O.
Eagles
15,000.00
16. Accts.
Receivable-
Chander
Steele
300.00
17. Accts.
Receivable-
Frank
Cousin
400.00
400.00
400.00
400.00
18.
1,299.20
1,299.20
1,299.20
1,299.20
1,299.20
1,299.20
Automobile
19. David
Thomas Co.
stock
210.00
210.00
210.00
210.00
20. Windsor
Hotel-Furn.
& Fixtures
5,824.06
5,824.06
5,824.06
21. Windsor
Hotel-Lease
hold Impr.
639.05
639.05
639.05
22. Windsor
Hotel-
Additions to
Furn. & Fix.
1,174.79
1,174.79
23.
Investment
in United
Nations
Club
6,248.48
24. Canyon
Club
18,111.17
18,111.17
18,111.17
Property
25. Interest
in Canyon
Club Part-
Ownership
5,770.29
26. Home,
personal
11,105.01
27. Personal
Furniture &
Fixtures
896.58
28. Prepaid
Insurance-
Canyon
Club
517.50
310.50
103.50
29. Furnace-
Canyon Club
1,600.00
1,600.00
1,600.00
30. Sofa-
Canyon Club
229.50
229.50
229.50
31. Improve-
ments-Canyon
Club
500.00
500.00
500.00
32. Septic
Tank-
Canyon Club
3,605.00
3,605.00
33.
Investment
in Golden
Hotel
5,000.00
2,564.86
Total Assets
$6,424.32
$17,656.78
$27,927.28
$64,329.53
$64,849.94
$81,150.64
34. Reserve
for
Depreciation
$
$ 350.70
$ 976.05
$ 1,917.13
$960.68
$ 1,840.82
Net Worth
6,424.32
17,306.08
26,951.23
62,412.40
63,889.26
79,309.82
Less Prior
Net Worth
6,424.32
17,306.08
26,951.23
62,412.40
63,889.26
Increase
in Net Worth
10,881.76
9,645.15
35,461.17
1,476.86
15,420.56
35. Personal
Living
2,905.60
3,484.65
4,354.83
4,435.80
5,030.67
Expenses
36.
Unidenti-
fied
Expendi-
tures
7,000.00
37. Drawings
from Canyon
Club
324.50
290.50
38.
Non-taxable
gain-United
Nations Club
(197.52)
39. Optional
Standard
Deduction
(500.00)
(500.00)
Corrected
Net
[3]
Income
13,787.36
13,129.80
39,442.98
5,703.16
27,451.23
Less
Reported
Net Income
667.19
(1,899.78)
(2,178.71)
574.00
1,707.95
Net
13,120.17
15,029.58
41,621.69
5,129.16
25,743.28
Adjustment
*312 Petitioner reported gross income from the following sources, net income and tax liability on his income tax returns for the years herein involved, as follows: 1942
1943
1944
1945
1946
Interest &
$ 20.04
$ 127.72
$ 125.80
$ 152.53
$ 400.15
Dividends
Windsor Hotel
683.51
382.59
914.35
1,434.26
Operations
Less: Net
(1,488.23)
Operating loss
deduction
Wilson Hotel
Golden Hotel
( 261.41)
Operations
United Nations
(2,410.09)
726.38
Club-Partnership
Canyon Club
(6,495.24)
(2,031.70)
Partnership
Canyon Club
2,550.00
3,180.74
3,387.46
Rentals
Gain or Loss on
Sale
of Business
( 673.60)
(1,115.09)
Assets
Totals - Gross
$705.55
($1,899.78)
($2,178.71)
$ 574.00
$2,411.11
Income
Net Income
$667.19
a
a
a
$1,707.95
(After
Deductions)
Total Tax Due
The following schedule sets forth for the taxable years involved the number of deposits and amounts *313 thereof made in petitioner's individual bank accounts (including deposits in accounts in the name of Letha Tacconi and excluding deposits in the Canyou Club account), gross receipts (exclusive of Canyon Club receipts) reported on petitioner's individual and the United Nations Club partnership income tax returns, the difference between the totals of the deposits made and receipts reported, and the grand totals of all the foregoing: 1942
1943
1944G
No. of
No. of
No. of
Dep.
Amount
Dep.
Amount
Dep.
Amount
Pete Tacconi Savings
Acct. 1st
Sec. Bk.
2
$ 535.92
1
$ 435.00
2
$ 2,460.00
Letha Tacconi Savings
Acct. 1st
Sec. Bk.
15
335.00
14
377.00
17
793.00
Pete Tacconi Checking
Acct. 1st
Sec. Bk.
20
10,528.90
32
18,897.85
40
38,122.95
Pete Tacconi Savings
Acct. Comm.
Sec. Bk.
1
3,049.57
Pete Tacconi Checking
Acct. Comm.
Sec. Bk.
6
5,879.89
Letha Tacconi Checking
Acct.
Comm. Sec. Bk.
Pete Tacconi Account
1st Fed.
Savings & Loan
10
4,152.72
1
200.00
Total - Dep.
47
$15,552.54
47
$19,709.85
67
$50,505.44
1945
1946
GRAND TOTALS
No. of
No. of
No. of
Dep.
Amount
Dep.
Amount
Dep.
Amount
Pete Tacconi Savings
Acct. 1st
Sec. Bk.
Letha Tacconi
Savings
Acct. 1st
Sec. Bk.
13
$260.00
22
$1,683.37
Pete Tacconi
Checking
Acct. 1st
Sec. Bk.
Pete Tacconi Savings
Acct. Comm.
Sec. Bk.
Pete Tacconi
Checking
Acct. Comm.
Sec. Bk
22
24,885.72
18
24,625.68
Letha Tacconi
Checking
Acct.
Comm. Sec. Bk
13
3,192.37
8
1,472.00
Pete Tacconi Account
1st Fed.
Savings & Loan
Total - Dep.
48
$28,338.09
48
$27,781.05
257
[4] 141,886.93
*314 1942
1943
1944
Receipts-Per
returns of
Pete Tacconi
and of
United
Nations
Club
Partnership
$4,604.89
[5] $23,992.20
[6] $12,146.16
Excess of
Dep. over
receipts
reported
10,947.65
(4,282.35)
38,359.28
GRAND
1945
1946
TOTALS
Receipts-Per
returns of
Pete Tacconi
and of
United
Nations
Club
Partnership
$13,313.53
$ 7,563.20
$61,619.98
Excess of
Dep. over
receipts
reported
15,024.56
20,217.85
80,266.99 The following schedule sets forth the *315 number of deposits and amounts thereof made in the Canyon Club partnership bank account during each of the periods from June 1, 1944, to December 31, 1944, and from January 1, 1945, to July 14, 1945, gross receipts reported on the partnership's income tax returns for 1944 and 1945, and the grand totals of all the foregoing: 1944
1945
GRAND TOTALS
No. of
No. of
No. of
Dep.
Amount
Dep.
Amount
Dep.
Amount
Canyon Club
Partnership,
Commercial Secu-
rity Bk.
29
[7] $44,594.30
23
$41,885.07
52
$86,479.37
Receipts-Per Canyon
Club partnership re-
turns
21,217.67
20,252.83
41,470.50
Excess of deposits
over receipts
$23,376.63
$21,632.24
$45,008.87
reported
The following table sets forth the dates during the taxable years involved on which petitioner entered into his safe deposit box and the dates and amounts of alleged corresponding deposits to his bank accounts: Entry to
Entry to
Safe Dep.
Deposits
Safe Dep.
Deposits
Box
1942
Box
1943
1942
Date
Amount
1943
Date
Amount
1/12
1/13
a $ 300.00
2/9
2/9
a $ 438.70
2/7
3/5
3/5
a 1,248.67
2/17
3/13
3/13
a 3,600.00
3/6
3/6
a 400.00
3/13
3/13
a 2,000.00
4/15
5/3
5/4
a 400.00
5/28
5/29
a 4,000.00
5/25
8/17
8/17
a 659.40
7/6
9/9
9/9
b 241.75
8/4
9/14
9/15
b 204.00
8/9
8/9
a 189.80
12/2
12/3
a 750.00
8/17
10/1
10/9
10/11
11/8
12/3
*316 Entry to
Entry to
Safe Dep.
Deposits
Safe Dep.
Deposits
Box
1944
Box
1945
1944
Date
Amount
1945
Date Amount
1/5
1/7
a $ 600.00
4/13
No.
1/7
b 200.00
4/19
corresponding
1/7
c 1,760.00
6/26
deposits
1/12
6/27
2/10
2/10
d 3,049.57
7.17
2/10
a 180.00
8/22
2/10
c 700.00
10/16
2/11
2/11
d 739.79
2/25
4/19
4.19
a 18,000.00
6/5
6/5
a 857.18
7/19
7/19
a 397.87
7/19
e 1,720.50
(Cash-913)
Entry to
Safe Dep.
Deposits
Box
1946
1946
Date
Amount
1/2
1/2
f $ 940.00
2/13
(Cash 890)
3/25
3/25
f 12,425.30
4/5
(Cash 4,000)
7/22
11/14
11/22
12/17
Petitioner has failed to prove that respondent's determination of income and consequent *317 deficiencies are incorrect. The deficiencies here involved were due to fraud with intent to evade tax. Opinion VAN FOSSAN, Judge: At the outset, petitioner contests respondent's use of the "net worth and personal expenditures" method of determining income, alleging that his books were adequate. We flatly disagree. The books were inadequate and large discrepancies were found between amounts deposited in banks and receipts reported. The acquisition by petitioner in its taxable years of valuable assets far in excess of admitted receipts was apparent to all. Petitioner's reputation as a gambler and bootlegger did not commend the probable accuracy of his accounts. If there were any doubt as to respondent's justification, the claim by petitioner that, on December 31, 1941, he had cash on hand in the amount of $50,000 to $60,000, of which there was no record and which he had never reported for taxation, would be notice to all the world that his accounts were not trustworthy. We hold that respondent was fully justified in the method of computing income which he employed. Addressing ourselves to the second claim of petitioner, i.e., that respondent's computation was inaccurate, we find *318 that by his stipulation of certain facts as to assets owned by him throughout the years 1942 to 1946, petitioner has, in large part, admitted the basic correctness of respondent's finding as to unreported income. His attack on respondent's actual computation centers chiefly on the failure of respondent to give him credit for alleged large sums of cash on hand at January 1, 1942, the beginning of the taxable period. In this connection, the case follows a well worn pattern. He contends that, in his safe deposit box, to which he resorted from time to time to obtain funds later deposited in various banks, he had large sums of accumulated cash. Thus he undertakes to account for such large deposits in such banks. This contention of petitioner is weakened, if not totally destroyed, by his failure to offer any real substantiation or record of such funds and to prove the source of such alleged funds. We are utterly unable to believe or credit the testimony of the witness who stated that he saw and counted the sum of $40,000 kept in the safe deposit box. Yet stronger evidence against petitioner's claim is the presence in the record of an affidavit of proverty signed and sworn to by petitioner *319 in 1937 at the time he desired to prosecute an appeal from an adverse decision in the Federal District Court. If this affidavit spoke the truth, petitioner had no funds in the safe deposit box, or elsewhere, in August 1937. If the affidavit was false, petitioner stands revealed as a perjurer, and not worthy of belief even under oath. Petitioner testified that he was inactive in business from 1934 to 1940, thereby lessening the period for accumulating the alleged funds. The record for the ensuing years is confused and unconvincing as to petitioner's financial transactions. We are convinced that petitioner's chief source of income throughout was gambling, either by personal play or by operating a gambling place. It cannot be overlooked that throughout his entire life, petitioner has lived on that ragged fringe of a society that exists only by lawless and illegal conduct. He is an admitted bootlegger, a gambler, and operator of gambling resorts. He never made an income tax return prior to 1942, although he claims to have accumulated from $50,000 to $60,000 during such years. During the years 1942 to 1946 the tax returns filed by petitioner showed no tax due for any year. Petitioner's *320 statement that he thought that he was not required to report as income funds acquired in "unlegal" transactions cannot be held to absolve the taxpayer from the consequences of such failure to file. Being unable to give full credence to petitioner's testimony, and being met by a failure of proof on every important phase of the case, we would be obliged to resort to sheer speculation to find the facts as petitioner asks us to do. Petitioner points to the coincidence in time of many of his frequent visits to the safe deposit box with the dates of deposits by him of money in the various banks. The inference that he withdrew money from the box and deposited it in the banks on the same or next day is but little, if any, more logical than that his gambling had been profitable and that the cash on hand currently acquired was deposited in part in the bank and in part in the box, thereby creating the coincidence in time. Petitioner's testimony as to withdrawals from the box and deposits in the banks was unconvincing and lacking in continuity. Applying our best judgment to a record notoriously vague and inadequate, we are unable to find the facts to justify any revision of respondent's computation. *321 Were we to hold that petitioner did, as he contends, withdraw large sums from the box and deposit them in the banks, we still would lack evidence disassociating those sums from income, nor could we, with assurance, find that the sums were taxable in any other year than as found by respondent. These matters were all comprehended in the burden of proof which rested on taxpayer. He must bear the onus of the failure to establish the facts essential to a judgment in his favor. This conclusion applies also to respondent's determination of the amounts to be charged as personal expenses. As to this item, there is a complete failure of proof. As to the charge of fraud, the burden of proof rests on respondent, who must prove by clear and convincing evidence the fact of fraud. The old Latin maxim fraus est odiosa et non praesumenda must be kept in mind. Fraud is not to be presumed. It must be proven by clear and convincing evidence. Since it is largely a matter of intent, we are required to look into the taxpayer's mind and there search for the intent to defraud. The reputation of the taxpayer and the character of his business dealings may be considered but, standing alone, are not enough. *322 The failure by taxpayer, however, adequately to explain away his failure to report for taxation large sums of money received in the taxable years in question is consistent only with a fraudulent intent, which has been held to justify a finding of fraud. Intent is a state of mind which must be established as other finding, on the whole record and by clear and convincing evidence, that the proscribed intent existed, with consequent fraud. When all of the facts here present are weighed and placed in juxtaposition each with the other, we find a firm conviction in our minds that the deficiencies in taxpayer's income were unquestionably due to intent by taxpayer to defraud the Government of taxes due. The finding of fraud applies to all years in question and requires that we hold further that petitioner is denied the employment of the forgiveness provisions of section 6 of the Current Tax Payment Act of 1943. Decision will be entered for the Respondent. Footnotes
1. In his 1946 return, petitioner incorrectly computed the loss from this sale as being $1,115.09; it should be $825.65.↩
2. The loss was recorded only after a deduction was taken for alleged net operating losses from other enterprises carried forward from previous years.↩
3. This figure erroneously appeared as $5,693.16 in respondent's initial computation and statutory notice of deficiency.↩
a. Net income not shown on return since losses or alleged low income resulted in no tax liability.↩
4. Deposits tabulated in this schedule have not been adjusted to eliminate inter-account transfers, cash deposits from petitioner's safe deposit box, repayment of loans, return of investments and other non-income items.↩
5. This figure includes $16,146.58, which represents one-half of the gross receipts of the United Nations Club partnership operations. The bank statements for the United Nations Club partnership were not in evidence; therefore, we have no knowledge as to the extent to which receipts from that operation were reflected in bank deposits. ↩
6. This figure includes one-half, $2,601.11, of United Nations Club receipts. See note 5, supra.↩
7. Exclusive of opening deposit of $2,000, June 2, 1944.↩
a. Petitioner's checking account in First Security Bank. ↩
b. Petitioner's account in First Federal Savings and Loan Association. ↩
c. Petitioner's savings account in First Security Bank. ↩
d. Petitioner's savings account in Commercial Security Bank. ↩
e. Canyon Club partnership checking account in Commercial Security Bank. ↩
f. Petitioner's checking account in Commercial Security Bank.↩